ENGLISH W. SHIELDS AND MUTUAL SAVINGS & LOAN ASSOCIATION OF REIDSVILLE, NORTH CAROLINA v. NATIONWIDE MUTUAL FIRE INSURANCE COMPANY

No. 8017SC402

(Filed 20 January 1981)

**Damages § 17.7— insurer's denial of claim — punitive damages — summary judgment for insurer proper**

In an action to recover compensatory and punitive damages allegedly resulting from the destruction by fire of a building owned by plaintiff and insured by defendant, trial court did not err in granting summary judgment for defendant on the issue of punitive damages, since the fact that defendant denied plaintiff's claim on its belief, based on its investigation, that plaintiff was involved in the fire did not show bad faith on the part of defendant; the claim was not denied until some 19 months after the fire, during which time the investigation continued; and upon the information obtained in that investigation, defendant denied the claim.

APPEAL by plaintiff from *Long, Judge.* Judgment entered 20 November 1979, Superior Court, ROCKINGHAM County. Heard in the Court of Appeals 16 October 1980.

By this action plaintiff seeks compensatory and punitive damages allegedly resulting from the destruction by fire of a building owned by him and insured by defendant. The court allowed defendant's motion for partial summary judgment as to punitive damages and denied the motion as to compensatory damages. Plaintiff appeals from the order dismissing his claim for punitive damages. The following appears in the record "Pursuant to order, stipulation, and agree-

ment of the parties, defendant is presenting its appeal to that part of the order denying its motion for partial summary judgment regarding plaintiff's claim for compensatory damages for defendant's alleged tortious conduct." Facts necessary for decision appear in the opinion below.

*Griffin, Post, Deaton and Horsley, by William F. Horsley, and Harrington, Stultz and Maddrey, by Joseph G. Maddrey, for plaintiff appellant.*

*Hudson, Petree, Stockton, Stockton and Robinson, by W. Thompson Comerford, Jr., for defendant appellee.*

MORRIS, Chief Judge.

In substance, plaintiff's allegations supporting his claim for punitive damages were these: the loss by fire occurred on 6 July 1976, within the 60-day period for which the policy provided and on 25 August 1976, plaintiff, through his attorney, mailed defendant a proof of loss on a form furnished by defendant. On 13 September 1976, after the expiration of the 60-day period, a fact well known to defendant, defendant advised plaintiff that it could not accept "this paper as a sworn statement in proof of loss." Prior to receipt of the proof of loss, and on 3 August 1976, defendant cancelled plaintiff's insurance coverage, including coverage on other properties. Prior to the issuance of the policy upon which suit is brought, defendant's agent appraised the property to be insured at $140,000 and offered to insure it for $126,000. By implication, defendant has claimed that plaintiff grossly overinsured the property, and has also implied that plaintiff had a motive for destroying the property. Although defendant, at the beginning, formed an intent to deny plaintiff's claim, it, nevertheless, required plaintiff to follow all requirements of the policy including forcing him to undergo a deposition and to undergo an $11,000 expense for an appraiser. These things were done to harass and intimidate plaintiff to accept less than the full benefits due under the policy. Finally, defendant denied the claim and in the letter of denial "alleged, among other things, that plaintiff was involved in causing the fire and that he misrepresented facts to defendant concerning the loss. Neither of these allegations were (sic) true and they were made by defendant in careless and wanton disregard of the truth and in full knowledge that defendant did not have sufficient facts on which to base these allegations." Defendant knew, or should have known, that plaintiff was over 65 years of age and in poor health. "Throughout its handling of

Shields v. Insurance Co.

this claim, defendant has failed and refused to act expeditiously and in accordance with its obligation of good faith and fair dealing. It has, on information and belief, acted in a manner designed to deprive plaintiff of some, if not all, of his policy benefits and he is therefore entitled to an award of punitive damages for defendant's bad faith."

In *Newton v. Insurance Co.*, 291 N.C. 105, 229 S.E. 2d 297 (1976), a case upon which both parties rely, and a case in which the Court reviewed the judicial history of attempts to obtain punitive damages in breach of contract cases, the plaintiff sought punitive damages in an action alleging breach of an insurance contract in that plaintiff had demanded payment of defendant insurer, and defendant had refused to pay. The allegations constituting the basis for plaintiff's claim for punitive damages were:

7. That from time to time the plaintiff has made known to defendant and its agents, servants and employees that he was in desperate need of the proceeds of said insurance policy to which he was entitled to satisfy pressing financial matters caused by the loss above mentioned, and by reason of a loss by fire with which defendant was familiar. Notwithstanding the knowledge of defendant of said conditions, the defendant has neither made nor offered to make payment to plaintiff or to negotiate a settlement of plaintiff's claim under said policy of insurance.

8. Defendant at said times knew that plaintiff had floor plan and financing arrangements with creditors in the regular course of business and that each day great and high costs of financing were being incurred by plaintiff. Defendant further knew that plaintiff had payments to make upon liens and deeds of trust which constituted an expense of his said business and that said obligations involved the payment of interest each day. Defendant further knew that by reason of the losses sustained by plaintiff and the failure and refusal of defendant to properly settle and pay plaintiff the sums to which he was entitled under the said policy of insurance for the two losses sustained by plaintiff, that plaintiff would not be able to effectively carry on his business and that it was essential that he receive from the defendant the sums to which plaintiff was entitled under

said policy of insurance in a prompt and expeditious manner.

9. Defendant, notwithstanding the foregoing, in heedless disregard of the consequences which it knew plaintiff would experience by defendant's failure to comply with the terms of its policy of insurance and in an oppressive manner failed and refused to comply with the express terms of its policy of insurance issued to plaintiff.

10. That by reason of its heedless, wanton and oppressive conduct as aforesaid, defendant has subjected itself to the penalty of punitive damages, and the plaintiff is entitled to recover of defendant punitive damages in the sum of at least $50,000.00.

291 N.C. at 110, 229 S.E. 2d at 300.

The Court held that the trial court, upon defendant's motion under Rule 12(b)(6), properly dismissed the punitive damages claim, because

> The breach of contract represented by defendant's failure to pay is not alleged to be accompanied by either fraudulent misrepresentation or any other recognizable tortious behavior. As in *King v. Insurance Co., supra,* and *Ledford v. Travelers Indemnity Co.,* 318 F. Supp. 1333 (W.D. Okla. 1970), the allegations in the complaint of oppressive behavior by defendant in breaching the contract are insufficient to plead any recognizable tort. They are, moreover, unaccompanied by any allegation of intentional wrongdoing other than the breach itself even were a tort alleged. Punitive damages could not therefore be allowed even if the allegations here considered were proved. The trial court properly allowed defendant's motion to dismiss this claim.

291 N.C. at 114, 229 S.E. 2d at 302.

Plaintiff derives comfort and bases its position upon the following excerpt from *Newton:*

> We need not now decide whether a bad faith refusal to pay a justifiable claim by an insurer might give rise to punitive damages. No bad faith is claimed here, nor are any facts

alleged from which a finding of bad faith could be made. Insurer's kowledge that plaintiff was in a precarious financial position in view of his loss does not in itself show bad faith on the part of the insurer in refusing to pay the claim, or for that matter, that the refusal was unjustified. Had plaintiff claimed that after due investigation by defendant it was determined that the claim was valid and defendant nevertheless refused to pay or that defendant refused to make any investigation at all, and that defendant's refusals were in bad faith with an intent to cause further damage to plaintiff, a different question would be presented.

We are slow to impose upon an insurer liabilities beyond those called for in the insurance contract. To create exposure to such risks except for the most extreme circumstances would, we are certain, be detrimental to the consuming public whose insurance premiums would surely be increased to cover them.

On the other hand, because of the great disparity of financial resources which generally exists between insurer and insured and the fact that insurance companies, like common carriers and utilities, are regulated and clearly affected with a public interest, we recognize the wisdom of a rule which would deter refusals on the part of insurers to pay valid claims when the refusals are both unjustified and in bad faith. Punitive damages "have been allowed for a breach of duty to serve the public by a common carrier or other public utility. See: *Carmichael v. Southern Bell Telephone & Telegraph Co.,* 157 N.C. 21, 72 S.E. 619; *Hutchinson v. Southern R.R.,* 140 N.C. 123, 52 S.E. 263." *King v. Insurance Co., supra* at 398, 159 S.E. 2d at 893. Suffice it to say that we are not called upon here to adopt or reject such a rule.

291 N.C. at 115-16, 229 S.E. 2d at 303-04.

We think plaintiff's reliance misplaced. Assuming *arguendo* that plaintif has alleged sufficient facts constituting intentional wrongdoing other than the refusal to pay, and this is not before us, we are of the opinion that the trial court properly allowed defendant's motion for summary judgment as to the punitive damage claim. The materials before the court submitted by both plaintiff and defendant, includ-

ing interrogatories and answers thereto, deposition testimony, affidavits and recorded interview with plaintiff, show the following:

In response to interrogatories, defendant answered:

The plaintiff misstated and misrepresented the value of the premises to be insured; the fact that he had not sought to obtain other insurance on the premises prior to the issuance of the defendant's policy; the amount of repairs and improvements to be made on the property covered by the policy of insurance, prior to the issuance of the policy; the amount of repairs or improvements made at the time of the fire on or about July 6th, 1976; the amount expended for materials and labor in connection with repair and improvements on the premises; the relationship between himself and previous owners of the property; the existence of liens, mortgages, deeds of trust or other encumbrances on the property at the time of the issuance of the policy and at the time of the fire; the purchase price of the property; the fair market value of the property; his involvement in or procurement of the fire which occurred on the property on or about July 6, 1976; his knowledge as to the perpetrator of the fire which occurred upon the property on or about July 6, 1976; the fact that he had never been refused insurance coverage at the time of the issuance of the policy in suit; the manner in which the fire occurred.

Further defendant responded "Information obtained by defendant indicates that this fire originated through either the direct setting by Mr. Shields, his acquiescence in the setting of the fire, or his procurement in the setting of the fire."

Plaintiff said that he bought the property for aproximately $70,000, that there was a first mortgage of $29,500 to Mutual Savings and Loan, Reidsville, a second mortgage of $15,000 to the seller and that he paid the seller $25,000 in cash. He had been remodelling the building prior to the fire and had spent some $18,000 to $20,000, all of which was paid in cash, and that the receipts for the money were "placed on nails in the office and had been destroyed or lost in the fire." He had never been refused insurance by anyone. He had a fire in a building in Spray some fifteen years previously. That building was also being remodelled, and he received $16,000 in settlement of the insurance coverage.

In answers to interrogatories plaintiff indicated that the facts upon which he based his claim for punitive damages were that the groundless accusation that plaintiff was involved in the fire and that the insurance industry is a regulated one, akin to a public utility, and "The actions taken by defendants, its agents, servants and representatives actually engaged in by defendant and ratified by defendant, constitute a breach of its obligation to deal with its insured fairly and in good faith."

The affidavit of the SBI agent who investigated the fire revealed that it was determined that the fire was "probably the work of an arsonist" but that no law enforcement officer had determined the identity of the person who set the fire. The agent was aware of no evidence implicating plaintiff, and no criminal charges had been made as the result of the fire.

Defendant's agent who wrote the policy which is the basis of this litigation stated, by affidavit, that he inspected the premises, stated to plaintiff that he believed the property was worth $140,000, and offered to insure up to 90% of that amount, or $126,000. Plaintiff chose to purchase insurance in the amount of $110,000, and the policy was written for that amount. His opinion as to the value was based on what the building would be worth after the renovations. Plaintiff told him he was going to spend $87,000 on the building. When he went to examine the premises on 23 June he did not see any building materials there, but a lot of tearing down was going on. Plaintiff never advised the agent that anyone had a mortgage interest in the property, but the seller did so advise him. Plaintiff told him there were none. After the fire, the agent saw straw stacked up in one specific part of the building which had not been there when he came to inspect the premises on 23 June.

Plaintiff, by deposition, testified that some 10 or 12 years prior to this occurrence he had a fire loss on a building he was getting prepared to rent and that he did have insurance on that property. He bought the property involved in this action in 1976. He paid the seller $25,000 down in $100 bills, assumed a $30,000 loan, and gave the seller notes for $15,000 secured by a second deed of trust on the property. He talked with an agency other than defendant and was told that he could purchase $100,000 insurance, but the coverage would have to be placed with two different companies. He had asked for $100,000 because he thought that was what the property was worth based on

what he had put in it and intended to put in it. This was two to four days after he bought the property when he "had not put much in it." He then went to defendant about insurance and defendant's agent who viewed the property. Plaintiff told him that he intended to "fix it into apartments." He planned for nine apartments. Plaintiff had four men working on the property, and he paid them in cash each week, but did not get a receipt. "I kept my records as to how much I was paying them set down on papers there on a little table thing. We had a little room fixed up for an office. They got burned, I guess. I had all of that in the building on Riverside Drive. I never kept any records of what I paid the men, however." He did not obtain a building permit. The seller told plaintiff that he had gotten one. Plaintiff did not recall whether he signed a note for the $15,000 due the seller. He was to begin paying that when he began renting the apartments. He heard somebody say something about straw or hay "being in there after the fire," but he never saw any and did not smell kerosene or fuel oil in the building after the fire.

Defendant's claims supervisor testified, by deposition, that his suspicion was aroused by the fact that the fire occurred so quickly after issuance of the policy together with the fact that the notice of loss indicated that the fire started on the second floor "from unknown causes." He had no idea who burned the premises but was suspicious of plaintiff, having formed that opinion when he received Mr. Hill's report.

Linley Tate's deposition testimony was that he bought the property in 1975 for $10,000 with the intent to renovate it and then sell it. He did very little work on it, but sold it to William Clyde Reagan for $40,000 but did not remember when.

Reagan said he bought it in early 1975, paying $10,000 in cash as a down payment and financed $30,000 through the Mutual Savings and Loan. He obtained insurance in the amount of $100,000. He spent approximately $20,000 in repairing the property before selling it to plaintiff.

Defendant caused a thorough investigation to be made. The investigation was "a result of a joint effort by the defendant's consultants, agents and under the direction of defendant's attorneys." Some seven reports were made to defendant. These were not subject to discovery.

We are not called upon to say whether the uncontradicted evidence presented on motion for summary judgment is sufficient to withstand a motion for directed verdict in the claim for compensatory damages, yet to be heard. In our opinion, the materials submitted to the trial tribunal are clearly insufficient to support a claim for punitive damages. The fact that the defendant denied plaintiff's claim on its belief, based on its investigation, that plaintiff was involved in the fire certainly does not show bad faith on the part of the defendant. The claim was not denied until some 19 months after the fire. Defendant's investigation continued during that time. Upon the information obtained in that investigation, defendant denied the claim. We do not express an opinion as to whether the denial was justified. We simply say the materials presented clearly show no entitlement to punitive damages.

Defendant attempts to bring forward for our review the question of whether the court erred in denying its motion for partial summary judgment on the compensatory damages claim. Denial of a motion for summary judgment is not immediately appealable. Movant properly preserved its exception to the entry of the judgment and this exception can be considered on appeal from the final judgment without substantial harm to defendant. *Golden v. Golden,* 43 N.C. App. 393, 258 S.E. 2d 809 (1979).

As to plaintiff's appeal from the order allowing defendant's motion for summary judgment — affirmed.

As to defendant's attempted appeal from the denial of its motion for summary judgment on the compensatory damages claim — dismissed.

Judges HEDRICK and MARTIN (Robert M.) concur.